Case 1:08-cv-12051-DPW   Document 14   Filed 08/31/10   Page 1 of 19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| OAK KNOLL HEALTH CARE CENTER, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:08-CV-12051-NG |
| Michael Leavitt, in his official capacity as Secretary of The United States Department of Health and Human Services, | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff Oak Knoll Health Care Center ("Oak Knoll") brings this action to overturn a

decision by the Administrator of the Centers of Medicare and Medicaid ("CMS") (formerly, the

Health Care Financing Administration)[1] denying Oak Knoll's request to be reimbursed at the

"transitional" period rate for a Skilled Nursing Facility ("SNF") under 42 U.S.C. §1395yy and 42

C.F.R. §413.340(e).  The Administrator's denial reversed a unanimous decision of the Provider

Reimbursement Review Board (the "Board") which had granted Oak Knoll transitional rate

reimbursement.

The Administrator's reversal was improper and not in accordance with the law.  Under

the applicable statute and regulation, an SNF that first received a Medicare payment, under

present or past ownership, prior to October 1, 1995, is eligible for transition rate reimbursement.

Here, Oak Knoll's predecessor institution received Medicare payments prior to October 1, 1995.

---

[1] CMS falls under the authority of the defendant Secretary of the United States Department of Health and Human
Services who is now Kathleen Sebelius, but was Michael Leavitt at the time this action was filed.

1

2

CMS has admitted that Oak Knoll is the same institutional SNF that first received Medicare payments prior to October 1, 1995.  The Administrator, however, excluded Oak Knoll from receiving such payments during the 1999-2001 transition period based CMS's interpretation of the statute and regulations as stated in Section 2834A of Part I of the Provider Reimbursement Manual (the "Manual") published by CMS without notice or comment on or about July, 1998. That section of the Manual provides that transition period payments may be made to an SNF only if it first received payment from Medicare prior to October 1, 1995 "under its current provider number."  In its decision, the Administrator ruled that Oak Knoll was not eligible for transition rate payments because in 1999 it did not have the same Medicare provider number and agreement as it had when it received Medicare payments prior to October 1, 1995.

The effect of the Administrator's denial is to deprive Oak Knoll of approximately $1.4 million for the 1999 fiscal year alone and additional monies during fiscal years 2000-2001.

As set forth below, the Administrator's decision conflicts with the plain language of the federal statute and regulation at issue in this case.  Further, there is no basis in the statute or the regulation for the "provider number" restriction set forth in Section 2834A of the Manual. Accordingly, that section of the Manual is an invalid exercise of rulemaking authority by CMS and provides no basis for denying Oak Knoll transition rate reimbursement.  Oak Knoll requests that the Court reverse the Administrator and enter an order requiring CMS to grant Oak Knoll transition rate reimbursement for fiscal years 1999-2001.

2

## II.   THE FEDERAL REGULATORY SCHEME

### A.   The Medicare Program and Skilled Nursing Facilities

Congress established the Medicare Program to ensure that the aged and disabled would have access to health care services.  See 42 U.S.C. s§1395, *et. seq.*  Under the Medicare Program, CMS, acting under the authority of the Secretary of the Department of Health and Human Services ("Secretary"), reimburses qualifying health care providers for costs incurred in treating Medicare patients.  42 U.S.C. §1395cc, 1395g, 1395xx(v)(1)(A).

Various types of entities may participate as Medicare providers, nursing facilities among them.  Not all nursing facilities qualify to participate in Medicare, however,  Among such facilities, Congress recognizes as Medicare health care providers only "skilled nursing facilities" commonly referred to as "SNFs."  See 42 U.S.C. ¶1395y(u).  Congress has defined a "skilled nursing facility" to be an "institution", or a distinct part of an institution, that is:

> primarily engaged in providing to residents –
>
> (A)   skilled nursing care and related services for residents who require medical or nursing care, or
>
> (B)   rehabilitation services for the rehabilitation of injured, disabled, or sick persons ….

42 U.S.C. §1395i-3(a) (emphasis added).

"Fiscal intermediaries" (typically private insurance companies) serve as claims managers for the Medicare Program at the local level pursuant to contracts between the fiscal intermediaries and CMS.  42 U.S.C. §1395h.  At the close of each cost reporting period (also known as a fiscal year), each provider submits a comprehensive cost report.  The fiscal intermediary then reviews each provider's report, determines the final amount of Medicare reimbursement due to the provider, and issues the provider a Notice of Program Reimbursement

3

("NPR").  42 U.S.C. §1395g.  A provider dissatisfied with the intermediary's determination may file an appeal with the Board.  42 U.S.C. 1395oo(a).

### B.      The New Provider Exemption to Routine Cost Limits

Under Section 1861(v)(1)(a) of the Social Security Act, Medicare SNFs are entitled to reimbursement for the reasonable costs they incur in treating Medicare patients.  See 42 U.S.C. §1395x(v)(1)(A).  The same section of the Social Security Act authorizes the Secretary to establish limits on operating costs that may be reimbursed to Medicare providers.  Specifically, the Secretary, acting through CMS, may establish limits, know as "routine cost limits," on operating costs that may be reimbursed to providers such as skilled nursing facilities.  42 C.F.R. §413.30.  Routine cost limits are determined on a per patient per day basis.

The Medicare Program regulations permit various forms of adjustment to the routine cost limits.  Under the regulations in place in 1995, a skilled nursing facility that met certain criteria was deemed a "new provider," and thus was eligible for an exemption from the routine cost limits.  42 C.F.R. §413.30(e) (1997).  Section 413.30(e) defined a "new provider" as "a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years."  Id.

A new provider exemption entitles a skilled nursing facility to reimbursement from Medicare for all of its actual nursing service costs, without the cap imposed by the routine costs limits.  The purpose of the new provider exemption regulation was to accommodate the risks to the company of a new startup:  new providers take the chance that their initial patient occupancy will be low or that they will incur other startup challenges that cause their initial operating cost to be high.  See 44 Fed. Reg. 31802 (1979).  Section 413.30(e) provided that the exemption

4

"expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts the first patient." Id.

### C. The PPS System and Transition Period Reimbursement

Until July 1998, SNFs were reimbursed for care provided to Medicare covered residents through a retrospective cost-based system. However, the Balanced Budget Act of 1997 (42 U.S.C. §1395yy et seq.) altered this reimbursement methodology and mandated a prospective payment system ("PPS") for cost reporting periods beginning on or after July 1, 1998. The PPS system provides for a prospective per diem "Federal" rate for Medicare SNF benefits (the "Federal Rate"). Id.

The PPS reimbursement rate is phased in over a three-year transition period. During the transition phase, SNFs receive a rate comprised of a blend between the Federal Rate and a facility-specific rate based on each provider's fiscal year 1995 cost report. During the first year of implementation, the old facility specific rate accounts for 75% of a facility's reimbursement with the Federal prospective calculation accounting for 25% of the facility's rate. In the second year of operation, these percentages change to 50% each and in the third and final transition year, the respective percentages are 25% and 75%. By the fourth year, the entire reimbursement rate is prospectively determined using the Federal Rate. 42 C.F.R. §413.340(a).

Pursuant to the operative statute (42 U.S.C. §1395yy) (the "Statute") and regulation (42 C.F.R. §413.340(e)) (the "Regulation") any SNF who first received a Medicare payment under present or past ownership prior to October 1, 1995, is eligible to receive transition period reimbursement.

1170462v1/7397-12 8/31/2010

### III.    SUMMARY OF UNDISPUTED FACTS

####    A.    Oak Knoll

Oak Knoll is a replacement facility for the former skilled nursing facilities Heritage Long Term Care Center ("Heritage") and Colonial House Nursing Home ("Colonial").  Oak Knoll is located on the same site as Heritage and Colonial on Arbetter Drive, Framingham, Massachusetts.  (AR 176, 2889)[2]

Heritage and Colonial were merged and rebuilt as Oak Knoll pursuant to a certificate of need issued by the Commonwealth of Massachusetts Department of Public Health, Determination of Need Program.  (AR 160-164, 2889)  On or about November 6, 1995 the new building opened under the new name "Oak Knoll Skilled Nursing Facility".  At that time, all thirty-five residents of Heritage were transferred to the Oak Knoll building and the old Heritage building was closed.  (AR 640, 2890)  Oak Knoll was managed by the same group of individuals who had managed Heritage.  The former Medical Director of Heritage became Medical Director of Oak Knoll and, with minor exceptions, all of Heritage's staff moved to Oak Knoll.  (AR 644)

Colonial was certified for participation in the Medicaid program on May 1, 1980. (AR 168)  Heritage was certified for participation in the Medicaid program on July 1, 1981 and in the Medicare program on July 1, 1990.  (AR 2889)  Heritage terminated its participation in the Medicare program on October 31, 1995 and was assigned provider number 22A287, in view of the fact that it continued to participate in the Medicaid program.  (AR 2890)  It rejoined the Medicare program as Oak Knoll on November 20, 1995 at which time is it was assigned Provider Number 22-5682.  (Id.)

---

[2] "AR" refers to the Administrative Record submitted to the Court on April 10, 2009.

Oak Knoll operated a total of sixty-one beds during the cost-reporting year ended December 31, 1995.  Twenty of these beds were certified to participate in the Medicare program. (AR 2890)

Prior to their merger into Oak Knoll, Colonial and Heritage were owned and operated by FRM Corporation I and FRM Corporation II respectively.  Oak Knoll is owned by Arbetter Corporation.  All of these corporations are owned and controlled by Dr. Alfred Arcidi.  (AR 172-173, 2890)

Both Colonial and Heritage were institutions which provided skilled nursing care prior to October 1, 1995.  (AR 176, 2889-2890)  Heritage was certified for Medicare and received Medicare payments prior to October 1, 1995.  (Id.)  Oak Knoll is the same institution as Heritage.  (AR 2889)

### B.   CMS' Denial of Oak Knoll's Request for a New Provider Exemption

Oak Knoll initially requested a new provider exemption to the RCL for the fiscal year ending December 31, 1995.  (AR 39)  In February 1996, CMS determined that Oak Knoll was not a "new provider."  Instead, CMS determined that Oak Knoll was the same institution as Heritage which had been certified for Medicare prior to October 1, 1995.  In its decision denying Oak Knoll a new provider exemption, CMS stated:

> A new provider exemption would be granted to those providers of inpatient services that have operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and/or previous ownership, for less than 3 full years.
>
> **…We look at the operation of the institution or institutional complex under "past and present ownership" exclusive of specific provider numbers, names, etc., since these are subject to change – to determine if the institution or institutional complex provided skilled nursing or rehabilitative services.**

7

**Given this context, [Oak Knoll] was recertified for Medicare participation effective, November 20, 1995. [Oak Knoll], previously operated as two separate institutions, Heritage Long Term Healthcare Center (Heritage) and Colonial House Nursing Home (Colonial). …Therefore, [Oak Knoll] has operated as a SNF for more than 3 years and is considered to be an equivalent provider of skilled nursing or rehabilitative services.  …The separate institutions never ceased operations during this transition to a single operating institution, nor were residents removed from the premises**

Skilled Nursing and Rehabilitative Services were provided for 3 or more years at Heritage and Colonial prior to the merger, and are now provided at [Oak Knoll].

The operations of two institutions, Heritage a 40 bed SNF/NF and Colonial a 24 bed NF, both located in Framingham, Massachusetts, underwent a merger to create a single operating institution [Oak Knoll], now Provider Number 22-5682, located at the same site as the existing Heritage institution.  Heritage was certified as a SNF/NF since July 1, 1990, decertified itself on October 13, 1995, and re-entered the Medicare program on November 6, 1995.  Colonial and Heritage had operated in the manner of a SNF by providing skilled nursing and rehabilitative services for three or more years prior to their merger into a single operating institution and subsequent Medicare re-certification on November 20, 1995.

(AR 175-177)  (emphasis added)

## C.    CMS' Denial of Transition Period Reimbursement

For the 1999 fiscal year, Oak Knoll timely requested transition period rate payments because (as CMS previously had found) it was a SNF that first received payment from Medicare prior to October 1, 1995.  (AR 40)  Oak Knoll also requested that the transition period rate be carried forward into the subsequent two cost reporting periods (the 2000 and 2001 fiscal years) in accordance with the Statute and Regulation.  (AR 3205)

The Intermediary denied Oak Knoll transition period reimbursement based on Section 2834A of Part 1 of the Manual.  (AR 40)  Section 2834A of the Manual provides that transition period payments may be made to an SNF only if it first received payment from Medicare prior to

8

October 1, 1995 "under its current provider number" (hereafter referred to as the "Restriction").

(AR 192)

The requirement set forth in Section 2834A of the Manual that Medicare receipt be under the "current provider number" of the SNF does not appear in the applicable transition period statute or regulation. The relevant language is as follows:

The Statute:

(E)     Transition Period. -

        (ii)     TREATMENT OF NEW SKILLED NURSING FACILITIES.-In the case of a skilled nursing facility that first received payment for services under this title on or after October 1, 1995, payment for such services shall be made under this subsection as if all services were furnished after the transition period. (42 USC 1395yy(e)(2)(E)(ii)) (AR 197).

The Regulation:

        (e)     SNF's excluded from the transition period. SNF's that received their first payment from Medicare, under present or previous ownership, on or after October 1, 1995, are excluded from the transition period, and payment is made according to the Federal rates only. (42 CFR 413.340(e)) (AR 203).

The Restriction:

SNFs Receiving the Transition Period Rate.-SNFs who first received payment from Medicare (i.e., based on when the payment was issued by the intermediary), under its current provider number, prior to October 1, 1995 are paid based on the transition rate only and are excluded from receiving the Federal rate. For example, an institution that was assigned a Medicare provider number prior to October 1, 1995, and received its first payment from Medicare on or before September 30, 1995, would receive the transition rate. Where a merger or a consolidation has occurred, a determination is made based on the payment history of the surviving entity as indicated by the surviving SNF provider number. (The Provider Reimbursement Manual Part 1). (AR 192)

The Restriction set forth in the Manual was not promulgated by CMS after notice and comment period as required by the Administrator Procedure Act ("APA"), 5 U.S.C. §553(b) for formal rule making by an administrative agency. (AR 206-208)

9

CMS's denial of Oak Knoll's request for transition period reimbursement had the effect of significantly reducing Oak Knoll's Medicare reimbursement for the fiscal years 1999-2001. For the 1999 year alone, the denial reduced Oak Knoll's reimbursement by approximately $1.4 million.  (AR 149)

## IV.   PROCEDURAL HISTORY

Oak Knoll timely appealed CMS's denial of its request for transition period reimbursement to the Board.  (AR 40)  Oak Knoll also timely appealed CMS's denial of its request for a new provider exemption for the fiscal year ending December 31, 1995.  (AR 39) The Board consolidated the transition period reimbursement appeal with Oak Knoll's separate appeal of its denial of a new provider exemption.  The Board agreed to hear and decide the appeal on the basis of the Stipulated Facts and Record submitted to it by the parties.  (AR 37-43)

In a decision dated August 12, 2008, a unanimous Board ruled that Oak Knoll was entitled to the transition period payment rate because it had received Medicare payments before October 1, 1995.  The Board ruled that Section 2834A of the Manual "goes beyond the clear meaning of the controlling law and attempts to add an additional criterion to restrict entitlement to a transition period payment rate by including the phrase 'under its current provider number.'" The Board found that the Restriction in the Manual was "arbitrary and capricious."  (AR 42) The Board also ruled that Oak Knoll did not qualify as a new provider under 42 C.F.R. §413.30(e).  (AR 42-43)

CMS urged the Administrator to reverse the Board's decision with respect to transitional period reimbursement (AR 28-33), and the Administrator did so.  In a decision dated October 14, 2008 (the "Administrator's Decision"), the Administrator ruled that Oak Knoll is not entitled to transition period reimbursement because it was not under the same Medicare agreement with the

10

same provider number that it had prior to October 1, 1995.  (AR 10-18)  The Administrator affirmed the Board's decision that Oak Knoll was not a "new provider" for purposes of the 1995 fiscal year.  (AR 18)

## V.     STANDARD FOR REVIEW OF AN ADMINISTRATIVE DECISION

The Administrative Procedure Act ("APA") governs review of the Administrator's decision in this case.  See 42 U.S.C. §1395oo(f)(1).  Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

Where the Secretary's decision involves the interpretation of a Medicare statute the Secretary is entitled to deference, but "[i]f the intent of Congress is clear … the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).  "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."  Id. at 843 n.9.

The Secretary also is entitled to deference when he interprets his own regulations, but not if his interpretation is "plainly erroneous or inconsistent with the regulation."  Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994); see also Auer v. Robbins, 519 U.S. 452, 461 (1997).  Judicial deference is warranted only when the language of the regulation is "ambiguous."  Christensen v. Harris County, 529 U.S. 576, 588 (2000).  Where the statute and regulation at issue are unambiguous and directly address the issue presented, their plain meaning should control the Court's decision.  See In re Sealed Case, 237 F.3d 657, 667 (D.C. Cir. 2001).  Furthermore, "[w]hen an agency promulgates regulations, it is bound by those regulations and

11

may not attempt to subvert the rulemaking process through interpretation unsupported by the regulation's language." Ohio Cast Products, Inc. v. Occupational Safety & Health Review Comm'n, 246 F.3d 791, 794 (6th Cir. 2001). Even if Congress did not express its intent unambiguously, deference to an agency interpretation is appropriate only where "it is based on a permissible construction of the statute." LEAF v. U.S. E.P.A., 118 F.3d 1467 (11th Cir. 1997).

## VI.    ARGUMENT

### A.    The Statute and Regulation Unambiguously Permit Oak Knoll To Receive Transition Rate Payments

The key concept with regard to the transition rate is when an SNF received its first payment from Medicare. "SNFs that received their first payment from Medicare under present or previous ownership," prior to October 1, 1995 are eligible for transition payments. 42 CFR 413.340(e). In order for a facility to fall into this category, it must be treated as the same SNF that previously received payment under present or previous ownership.

Section 1819(a) (42 U.S.C. §1395-3(a)) defines Skilled Nursing Facility as "an institution (or distinct part of an institution)" (emphasis supplied) which provides skilled nursing care and services and meets certain other requirements set out in Sections 1819(b)-(d). (AR 393) An "institution" is an establishment or place. Inserting the statutory definition of SNF into the transition period definition (Section 1888(e)(2)(E)(ii)), the plain meaning of the language is that an institution which first received Medicare payments after October 1, 1995 would not be entitled to transition rate payments, and conversely an institution which first received Medicare payments prior to October 1, 1995 would be so entitled. The language is clear that SNF means an institution, not a particular operator, and certainly not an operator with a particular provider number or provider agreement. Congress could not have been more clear.

12

The same issue is raised in the interpretation of the "new provider" language under 42 C.F.R. 413.30(e):  A new SNF is a provider of inpatient services that has operated as a SNF "(or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than 3 full years."

The case law enforcing the new provider exemption is instructive.  It confirms that CMS must review the past and predecessor operations to determine whether the current provider is a wholly "new" institution.  A SNF is not "new" (1) when the current provider is established as a result of a change in ownership, South Shore Hospital Transitional Care Center, PRRB 99-D38, aff'd, South Shore Hospital v. Thompson, 308 F.3d 91 (1st Cir. 2002), (2) when a building is replaced even in a different location, Larkin Chase Nursing and Rehabilitation Center v. Mutual Omaha Insurance Company, PRRB 99-D8 aff'd Larkin Chase Nursing and Restorative Center v. Shalala, 99-00214 (D.D.C., Feb. 6, 2001) (AR 573-590), (3) regardless of whether a predecessor facility was closed prior to relocation, Stouder Memorial Hospital Subacute Unit v. Blue Cross and Blue Shield Association, Decision of Administrator, Review of PRRB 2000-D46 (AR 593-636), or (4) regardless of whether the predecessor was for a period of time out of the Medicare program, San Diego Physicians and Surgeons v. Aetna Life Insurance Co., HCFA Administrator Decision, Jan. 12, 1991, at CCH Medicare and Medicaid Guide ¶39,007, page 25,062.  (AR 638-641)  The test simply stated is whether the predecessor operated as a SNF (Stouder, p.11).

Likewise, under Section 413.340(e), the test is whether the current SNF provider or its predecessor received its first payment from Medicare prior to October 1, 1995.

The application of this rule to Oak Knoll demonstrates that it is entitled to the transition rate under Section 413.340(e).  As set forth above, in denying Oak Knoll a new provider exemption, CMS explicitly found that Oak Knoll is the same institution as Heritage which had

13

first received payment from Medicare prior to October 1, 1995. (AR 175-177) Further, in the proceeding before the Board, the Intermediary stipulated on behalf of CMS (and the Board found) that Oak Knoll is merely a replacement facility for the former Heritage and Colonial nursing homes located in the same location on Arbetter Drive in Framingham, Massachusetts. (AR 39, 2890) Accordingly, it is clear that Oak Knoll is entitled to transition rate payments.

**B.      Section 2834A Of The Manual Is Inconsistent With And Contrary to 42 USC §1395yy(e)(2)(E)(ii) and 42 CFR §413.340(e)**

In its decision overruling the Board, the Administrator, relying upon Section 2834A of the Manual, determined that Oak Knoll was not entitled to transition rate reimbursement because it was not under the same Medicare agreement with the same provider number that it had prior to October 1, 1995. The "provider number" Restriction set forth in the Manual is found nowhere in the Statute or the Regulation, however. There is no suggestion in the Statute that the definition of an SNF subject to transition rate reimbursement is limited to a provider with a particular provider number. Eligibility for transition rate reimbursement also does not hinge on whether an SNF enters into a Medicare agreement after October 1, 1995.

If Congress had intended transition rate reimbursement to depend upon the SNF's particular provider number or whether a replacement facility accepts or rejects an existing Medicare agreement, it could have and would have drafted the Statute differently. Further, if Congress had intended that CMS supplement or further define the eligibility criteria for transition rate reimbursement, Congress could have specifically conferred upon the agency the authority to promulgate such a legislative rule. It did not do so. Congress did neither because its intent was unambiguous and clear. Eligibility for the transition reimbursement rate was to be based only on the date of receipt of Medicare payments by the SNF – the institution – regardless of who the operator (or provider number) was on such date.

14

Moreover, the Restriction in the Manual is inconsistent with and limits the very regulation it purports to implement.  The transition rule articulated in §413.340(e) essentially tracks the rule articulated in the Statute substituting for the words "skilled nursing facility that first received payment for services under this title on and after" (emphasis supplied) the words "SNFs that received their first payment from Medicare, under present or previous ownership on or after" (emphasis supplied).  Nowhere does the Regulation suggest the gloss in the Restriction that transition rate treatment is tied to the use of a particular provider number or agreement. Indeed, the Regulation is consistent with the statutory language and concept that a SNF is an institution, irrespective of ownership – and that transition rate treatment turns on when the institution, regardless of ownership and regardless of provider number, first received payment.

No deference is due to an agency interpretation which is "at odds with the plain language of the statute itself" or which is an impermissible construction of the statute. LEAF, supra. The judicial rule is the same for construing a regulation.  A court should defer to an agency interpretation only if it is based on a permissible construction (Yang v. Immigration and Naturalization Service, 79 F.3d 932, 939 (9th Cir. 1996)) and it should not uphold an agency interpretation which would be inconsistent with the regulation it interprets. United States v. Larionoff, supra.; Orengo Caraballo v. Reich, 11 F.3d 186 (D.C. Cir. 1993).

Here, the Restriction could not be more inconsistent with the Statute and Regulation. Under the Statute and Regulation, Oak Knoll and other facilities in the same position, are eligible for the transition reimbursement rate. Under the Restriction, they are not.[3]  No deference therefore, should be afforded to the Restriction and the Administrator's decision should be

---

[3] In addition, a regulation may not serve to amend a statute (Koshland v. Helvering, 298 U.S. 441,447, 56 S.Ct. 767,720 (1936)) nor add to the statute "something which is not there." United States v. Calamaro, 354 U.S. 351,359, 77 S.Ct. 1138, 1143 (1957).  Certainly then a provision of a manual may not do so.  The Restriction amends the Statute and Regulation by adding something which is not there - the additional requirement that receipt of Medicare payments by a SNF be "under its current provider number."

15

reversed. <u>LEAF</u>, <u>supra</u>.  <u>See</u> <u>also</u> <u>Chemical Mfrs. Assn. v. U.S. E.P.A.</u>, 919 F.2d 158 (D.C. Cir. 1990); <u>Zarr v. Barron</u>, 800 F.2d 1484 (9th Cir. 1986).

      **C.**      **The Restriction Is An Invalid Substantive Rule Because CMS Failed to Follow The Notice and Comment Requirements of the <u>APA in Its Promulgation.</u>**

An agency rule is only exempt from the notice and comment procedures of the APA if it is merely an "interpretive rule" that does not "effect a substantive change in the regulations" which it implements or interprets and where it merely clarifies an ambiguity in existing law. <u>Warder v. Shalala</u>, 149 F.3d 73, 79 (lst Cir. 1998).  On the other hand, substantive rules which "affect individual rights and obligations" are subject to the APA's notice and comment requirements.  <u>Chrysler Corp. v. Brown</u>, 441 U.S. 281, 302-03 (1979); 5 U.S.C. §553(b)(A).

Here, as is evident in its application to Oak Knoll, the Restriction in the Manual clearly affects substantive rights and affects a substantive change in the Statute and Regulation. Specifically, prior to promulgation of the Restriction, neither the Statute nor the Regulation limited eligibility for the transition reimbursement rate based on receipt of Medicare payments under the "current provider number."  The Restriction, as implemented, narrows the number of SNFs eligible for the transition reimbursement rate from that established by Congress.  The Restriction, therefore, effected a substantive change in the Statute and the Regulation.  That substantive effect is "sufficiently grave so that notice and comment are needed to safeguard the policies under the APA."  <u>See</u> <u>JEM Broadcasting Co. Inc. v. FCC</u>, 22 F.3d 320, 327 (D.C. Cir. 1994); <u>Philips Petroleum Co. v. Johnson</u>, 22 F.3d 616, 620-21 (5th Cir. 1994).  An agency rule which "alters the rights and interests of parties" is not within the notice and comment exemption of 5 U.S.C. §553(b)(A).  <u>Inova Alexandria Hospital v. Shalala</u>, 244 F.3d 342, 349 (4th Cir. 2001).

16

Further, the Secretary cannot avoid the requirements of the APA by attempting to characterize the Restriction in the Manual as merely interpretive. "[I]t is well-established that an agency may not escape notice and comment requirements [of the APA] … by labeling a major substantive legal addition to a mere interpretation." Appalachian Power Co. v. Envtl. Protection Agency, 208 F.3d 1015, 1024 (D.C. Cir. 2000).

Since the Restriction altered the regulatory rule and contradicted the Statute and Regulation by adding new eligibility criterion without following the notice and comment procedures of the APA, it is invalid. See Davidson v. Glickman, 169 F.3d 996, 999 (5th Cir. 1999) (handbook provision which created new condition not found in regulations was a legislative or substantive rule requiring notice and comment under the APA and, in the absence thereof, the court invalidated the handbook provision.); Phillips Petroleum Co., supra at 620-21 (interpretive rule was subject to the notice and comment requirements of the APA as it directly contradicted the text of the regulation at issue.); JEM, supra at 326-27 (if substantive standard by which FCC evaluates license applications is altered, there is no exemption from the notice and comment requirement of the APA).

### D.      The Administrator's Policy Arguments Are Unavailing.

In support of its decision overruling the Board, the Administrator also argued that when a change of ownership occurs, a new owner, who does not assume the previous owner's Medicare agreement, should not be able to retain the benefits established under the previous agreement. This policy argument, however, finds no support in the language of the Statute or the Regulation. Further, the Administrator's argument makes no sense in the context of this case. Substantively, there was no change in ownership. Oak Knoll is controlled by the same person who controlled the predecessor SNFs.

17

Moreover, Oak Knoll's eligibility for transition rate reimbursement is not a benefit established under a previous Medicare provider agreement; it is a benefit conferred under the Statute based on the original date of payment. Congress's intent, as shown by the statutory language itself, was to exclude a new SNF from receiving transition rate payments only if it had not received Medicare payments prior to October 1, 1995. While the Statute only applies to providers who are certified in the Medicare program, there is no dispute that Oak Knoll *is* certified for Medicare. As a matter of fact and logic, an existing SNF that is "newly certified" as is the case with Oak Knoll may still meet the statutory and regulatory test of having received payment as a SNF prior to October 1, 1995. The purpose of the Statute was to allow older SNFs a transition period to move from the prior reimbursement method to the new prospective method of payment even if they were out of the program for a period of time. That policy applies here and requires that Oak Knoll receive transition rate reimbursement.

## VII.    CONCLUSION AND RELIEF REQUESTED

In the many respects shown above, the Secretary, acting through the Administrator, has attempted in this case to carry administrative discretion to insupportable extremes. The Administrator has ignored and rejected the plain language of the Statute and the Regulation in denying Oak Knoll transition rate reimbursement, a result which has caused substantial harm to Oak Knoll and impeded its ability to meet the needs of its patient population. The Administrator's decision not only conflicts with the Statute and Regulation, it also defies logic. The Administrator cannot both (i) preclude Oak Knoll from receiving a new provider exemption from routine service cost limits on the ground that Oak Knoll is the same provider as Heritage, *and* (ii) preclude Oak Knoll from receiving transition rate payments that are designed to allow an existing provider (such as Heritage, now known as Oak Knoll) a transition period in moving to

18

the new PPS system. The result of the Administrator's unfair action is a regulatory "double whammy" that was never intended by Congress when it created the transitional payment system. It follows that such a result should not be countenanced by this Court.

Accordingly, the Administrator's decision should be reversed and the Court should direct the Secretary to grant Oak Knoll's request for transition rate reimbursement for its 1999-2001 fiscal years in accordance with the Statute and the Regulation.

> Respectfully submitted,
> Plaintiff,
> OAK KNOLL HEALTH CARE CENTER
>
> By its attorneys,
>
>
> __/s/ Nicholas J. Nesgos_____
> Nicholas J. Nesgos, BBO No. 553177
> nnesgos@pbl.com
> James E. Kruzer, BBO No. 670827
> jkruzer@pbl.com
> POSTERNAK BLANKSTEIN & LUND LLP
> The Prudential Tower
> 800 Boylston Street
> Boston, MA 02199

Dated:  August 31, 2010                    (617) 973-6100

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2010, I electronically filed the foregoing Memorandum in Support of Plaintiff's Motion for Summary Judgment, with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to counsel for the Defendant

/s/ Nicholas J. Nesgos

19

1170462v1/7397-12 8/31/2010