UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

OAK KNOLL HEALTH CARE CENTER, )
                    Plaintiff,                )         C.A. No. 1:08-cv-12051-NG
                                                   )
            v.                                    )
                                                   )
KATHLEEN SEBELIUS, Secretary        )
of the U.S. Department of Health         )
and Human Services,[1]                     )
                    Defendant.              )
                                                   )

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO AFFIRM THE ADMINISTRATOR'S DECISION AND IN OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION[2]

Plaintiff Oak Knoll Health Care Center ("Plaintiff" or "Oak Knoll"), a skilled nursing facility ("SNF"), brings this action pursuant to 42 U.S.C. § 1395oo(f), to obtain judicial review of a final decision of the Administrator of the Centers for Medicare & Medicaid Services ("the Administrator"),[1] regarding the Medicare reimbursement due the facility for fiscal year ("FY") 1999. Plaintiff has now moved for summary judgment as to all claims. As set forth in detail below, because the Administrator applied the correct legal standards, and because the Administrator's decision is supported by substantial evidence in the record, defendant Kathleen Sebelius's ("Defendant's" or "Secretary's") motion to affirm the Administrator's decision should be affirmed, and Plaintiff's summary motion should be denied.

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Kathleen Sebelius, Secretary of the Department of Health and Human Services, is automatically substituted for her predecessor, Michael O. Leavitt.

[2]On this day, defendant Kathleen Sebelius filed a motion for leave to file excess pages with regard to a memorandum of law in support of a motion for summary judgment and in opposition to plaintiff Oak Knoll Health Care Center's motion for summary judgment. See Docket No. 17. Since the filing of that motion for leave, however, Defendant modified that memorandum of law into a memorandum in support of a motion to affirm the decision of the Administrator of the Centers for Medicare & Medicaid Services and also in opposition to plaintiff Oak Knoll Health Care Center's motion for summary judgment. The memorandum is still twenty-two pages in length, so the Defendant still seeks leave to file excess pages. The Defendant files this memorandum, which is in excess of the amount allowed by Local Rule 7.1(B)(4), because the deadline for Defendant's brief is today. However, the Defendant acknowledges that its motion for leave to file excess pages is still pending before the Court.

[1]The Centers for Medicare & Medicaid Services shall hereinafter be referred to as "CMS."

## I.   BACKGROUND

This case involves Medicare's prospective payment system ("PPS") for SNFs, which Congress enacted in 1997.  See generally Pub. L. No. 105-33, § 4432; 42 U.S.C. § 1395yy(e).  In enacting PPS for SNFs, Congress provided that the "Federal rates" calculated under the new payment system would generally be transitioned, with respect to a SNF, over the facility's first three cost-reporting periods subject to the new system.  42 U.S.C. § 1395yy(e)(1)(A),(2)(E). Congress stipulated, however, that certain "new" SNFs would be ineligible for such "transition period" payment.  42 U.S.C. § 1395yy(e)(2)(E)(ii).

In the administrative proceedings below, Oak Knoll sought to be reimbursed for the services that it provided to Medicare beneficiaries during FY 1999 on the basis of the transition period rates.  However, in a final agency decision, the Administrator determined that Oak Knoll was a facility described by section 1395yy(e)(2)(E)(ii) - i.e., that Oak Knoll was a new SNF that was ineligible for transition period payment.  The Administrator thus determined that Oak Knoll was properly reimbursed for FY 1999 based solely on the Federal rates.[2]  (Administrative Record ("A.R.")[3] 17-18).[4]

As this memorandum will demonstrate, the Administrator's denial of Oak Knoll's request for transition period reimbursement under PPS for SNFs is supported by substantial evidence, and is not arbitrary and capricious, an abuse of discretion, or contrary to law.  The Administrator's decision should thus be affirmed.

---

[2]Under the PPS system, Medicare reimburses SNFs through prospective, per diem, case-mix adjusted payment rates applicable to all covered SNF services.  This is what the term "Federal Rates" refers to.

[3]The Administrative Transcript was previously filed with the Court.  (Docket No. 9.)

[4]Oak Knoll has presented two different estimates of the Medicare reimbursement impact of the Administrator's decision.  Oak Knoll's current position is that the agency's denial of transition period payment deprived it of "approximately $1.4 million for the 1999 fiscal year alone."  (Memorandum In Support of Plaintiff's Motion for Summary Judgment ("Pl's. Mem."), Docket No. 14 at 2.)  However, in the underlying administrative proceedings, Oak Knoll alleged that the reimbursement impact of the decision for FY 1999 was $364,414.  (A.R. 127, 149, 3205.)  These estimates are discussed in greater detail in Section III, F, infra.

### A.    Legal and Administrative History

#### 1.    General Provisions

Enacted in 1965, the Medicare statute (42 U.S.C. § 1395 et seq.) establishes a national program of health insurance for the aged and disabled.  Original "fee for service" Medicare consists of two basic parts.  Part A of Medicare, 42 U.S.C. § 1395c et seq., provides for the payment of inpatient hospital and related post-hospital benefits on behalf of eligible individuals.  Part B of Medicare, 42 U.S.C. § 1395j et seq., establishes a voluntary supplemental insurance program intended for the payment of physicians' and certain other health services.

Congress has charged the Secretary of the Department of Health and Human Services ("the Secretary") with the responsibility for administering Medicare, and has authorized her to issue regulations and interpretive rules implementing the statute.  42 U.S.C. §§ 405(a), 1395hh(a), 1395ii.  The Secretary has delegated these responsibilities to the Administrator.  CMS has contracted with private insurance companies, referred to as fiscal intermediaries, to perform various functions under the program, such as determining the amounts due providers of services and making the actual payments.  42 U.S.C. § 1395h; 42 C.F.R. § 421.100.

#### 2.    Provider Agreements Under Medicare

Under the Part A program, payments are made to "providers of services" (e.g., hospitals and SNFs) for services provided to Medicare beneficiaries.  Before such payments can be made, however, the provider must be certified as in compliance with the applicable health and safety standards, 42 U.S.C. §§ 1395x(e) and 1395i-3, and must enter into a "provider agreement" with the Secretary.  42 U.S.C. §§ 1395f(a) and 1395cc(a)(1).  A new provider agreement will be effective no earlier than the date on which the on-site survey is completed.  42 C.F.R. § 489.13.  Once the agreement has become effective, the provider may bill Medicare for services provided to program beneficiaries under its assigned "provider number."  United States v. Vernon Home Health, Inc., 21 F.3d 693 (5th Cir. 1994).

Whenever a provider undergoes a change of ownership ("CHOW"), the "existing

provider agreement will automatically be assigned to the new owner." 42 C.F.R. § 489.18(c). In that event, the new owner will not be required to establish its initial eligibility to participate in the program. Rather, the new owner may continue to bill and receive payment from Medicare under the prior owner's provider number. Vernon Home Health, 21 F.3d at 696. However, if the existing agreement is assigned, the new owner will assume the liabilities of the former owner under that agreement. 42 C.F.R. § 489.18(d). Consequently, the new owner will be responsible for any Medicare overpayments made to the prior owner or for any civil monetary penalties and plans of correction imposed on the prior entity. See Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100, 1104 (8th Cir. 2000); Vernon Home Health, 21 F.3d at 696.

A new owner may decline to accept the assignment of the prior owner's provider agreement. See Deerbrook Pavilion, 235 F.3d at 1104; Vernon Home Health, 21 F.3d at 696. If assignment is declined, however, the purchaser will have to file an initial request for program participation, and independently demonstrate its compliance with the Medicare participation requirements. Id. Moreover, the new owner will be ineligible for Medicare reimbursement for any services provided Medicare beneficiaries between the effective date of the CHOW and the effective date of the new provider agreement (which cannot be earlier than the date on which the on-site survey is completed). 42 C.F.R. § 489.13.

### 3. The "Reasonable Cost" Reimbursement System And The "New Provider" Exemption

Prior to 1998, Medicare reimbursed SNFs for services provided to program beneficiaries on a "reasonable cost" basis. 42 U.S.C. § 1395f(b)(1). The statute defines "reasonable cost" as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Congress authorized the Secretary to determine the "methods" to be used in computing reasonable costs and to establish "limits" on the costs "to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services." 42 U.S.C. §§ 1395x(v)(1)(A) and 1395yy.

The Secretary exercised her authority under the statute by promulgating upper limits on allowable routine costs incurred by SNFs.  See 42 C.F.R. § 413.30.[5]  These cost limits were imposed prospectively, and were calculated on a per diem, per admission, or other similar basis. 42 C.F.R. § 413.30(a)(2).  The limits were based on factors such as the type of service rendered and the size of the facility.  42 C.F.R. § 413.30(b).

To accommodate the special needs of particular providers, the Secretary provided for various "exceptions" and "exemptions" to the cost limits.[6]  42 C.F.R. § 413.30(c)(1996).  A SNF that qualified as a "new provider" could request an exemption from the cost limits.  42 C.F.R. § 413.30(e)(1996).  The regulations defined a new provider as:

> a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified for Medicare, under present and previous ownership, for less than three full years.  An exemption granted under this paragraph expires at the end of the provider's first cost reporting period beginning at least two years after the provider accepts its first patient.

Id.[7]

The purpose of the new provider exemption was to address the "problem[] of initial underutilization" that new inpatient facilities may face.  See 44 Fed. Reg. 31,802 (June 1, 1979) (preamble to final rule).  Such underutilization tends to increase the costs of care provided by a facility on a per-diem basis.  Recognizing the "great difficulty [of] meeting the applicable cost limits" in such circumstances, the Secretary established an exemption from the cost limits for facilities that qualified as "new providers."  Id.

---

[5]The reasonable cost system reimbursed SNFs for three categories of costs: routine costs (room and board and other per diem charges), ancillary costs (specialized services, such as therapy and drugs), and capital-related costs.  The cost limits applied only to the first category of costs - i.e., routine costs.  51 Fed. Reg. 11253 (1986).

[6]An "exception" increased a SNF's cost limit to account for the circumstances justifying the exception.  A SNF that had an exemption was not subject to the limits.  44 Fed. Reg. 31,802 (1979).

[7]In 1999, the agency revised the regulation by changing the word "provider" to "SNF," and by redesignating the provision as section 413.30(d).  64 Fed. Reg. 42610, 42613 (1999).

**4.** **The PPS For SNFs**

In 1997, Congress amended the Medicare statute to establish PPS for SNFs, effective for cost-reporting periods beginning on or after July 1, 1998. See Pub.L. No. 105-33, § 4432; 42 U.S.C. § 1395yy(e). Under this system, Medicare reimburses SNFs through prospective, per diem, case-mix adjusted payment rates applicable to all covered SNF services ("the Federal rates"). However, in enacting this system, Congress provided that the Federal rates would generally be transitioned, with respect to a SNF, over the provider's first three cost-reporting periods subject to the new system. 42 U.S.C. § 1395yy(e)(1)(A),(2)(E). A SNF that was subject to a transition period payment was reimbursed at a blended rate consisting of an increasing percentage of the Federal rate and a declining percentage of a facility-specific rate ("FSR"). 42 C.F.R. § 413.340(a). The FSR was determined on a per diem basis, and was based on the allowable costs reported by the SNF during a base year (the provider's cost-reporting period beginning in Federal FY 1995), plus an estimate of the amount that would have been paid to the SNF under Medicare Part B, with provisions for updating. 42 U.S.C. § 1395yy(e)(3). After the transition period, payment to the SNF was based entirely on the Federal rates. 42 U.S.C. § 1395yy(e)(1)(B).

In enacting PPS for SNFs, however, Congress specified that certain "new" SNFs would be ineligible for transition period payment. The statute provides:

> Treatment of new skilled nursing facilities - In the case of a [SNF] that first received payment for services under [Medicare] on or after October 1, 1995, payment for such services shall be made under this subsection as if all services were furnished after the transition period.

42 U.S.C. § 1395yy(e)(2)(E)(ii). See also 42 U.S.C. § 1395yy(e)(3) ("[t]he Secretary shall determine [a FSR] for each [SNF] not described in paragraph (2)(E)(ii)").

CMS promulgated the following regulation pertaining to the exclusion of new SNFs from transition period payment:

> *SNFs excluded from the transition period.* SNFs that received their first payment from Medicare, under present or previous ownership, on or after October 1, 1995, are excluded from the transition period, and payment is made according to the Federal rates only.

42 C.F.R. § 413.340(e).  In its Provider Reimbursement Manual ("PRM"), CMS provided that "SNFs who first received payment from Medicare ..., under its current provider number, on or after October 1, 1995 are paid based on the Federal rate only."  PRM, § 2834; (A.R. 192).  See also 64 Fed. Reg. 41644, 41654 (July 30, 1999) (preamble to final rule).[8]

### 5. Provider Reimbursement Appeals

A provider that is dissatisfied with the denial of a claim for Medicare reimbursement may obtain an administrative hearing on such determination before the Provider Reimbursement Review Board ("the Board"), provided certain jurisdictional requirements are met.  See 42 U.S.C. § 1395oo.  The Board's decision in the appeal is final, unless the Administrator, within 60 days, reverses, affirms, or modifies the decision.  42 U.S.C. § 1395oo(f)(1).  A facility may obtain judicial review of any "final decision" of the Board or the Administrator.  Id.

### 6. Statement Of Facts And Prior Administrative History

Colonial House Nursing Home ("Colonial") and Heritage Long Term Care Center ("Heritage") were nursing facilities that were located at Arbetter Drive in Framingham, Massachusetts.  (A.R. 2889.)  Colonial and Heritage were owned by related entities, the FRM I Corporation and the FRM II Corporation, respectively.  Id.

Colonial was a 33-bed facility that was certified for participation in the Medicaid program effective May 1, 1980; Colonial never participated in the Medicare program.  (A.R. 1749, 2889.)

Heritage was a 40-bed facility that participated in the Medicaid program beginning on July 1, 1981.  (A.R. 1749, 3122.)  Effective July 1, 1990, Heritage participated in the Medicare program under Provider Number 22-5468.  (A.R. 1018, 1283, 2889.)

On September 1, 1987, the FRM II Corporation submitted an application for a

---

[8]Certain SNFs that were subject to transition period payment would have received higher payments under the Federal rates only.  CMS advised these providers that they could avoid the transition rates by terminating their existing provider agreements and applying for new agreements on or after October 1, 1995.  (A.R. 16-17, n. 18.)  Congress subsequently acted to allow SNFs, on or after December 15, 1999, to elect immediate transition to the Federal rates, but only for cost-reporting periods beginning on or after January 1, 2000.  Pub. L. No. 106-113, § 102.

determination of need ("DON") to the Massachusetts Department of Public Health ("DPH"). (A.R. 1723-1923.)  In the application, the corporation proposed that it would construct a modern, 123-bed facility that would be known as "Oak Knoll," and that would be located on the same site (i.e., Arbetter Drive in Framingham) as the Colonial and Heritage facilities.  (A.R. 1749.)  The applicant alleged that the need for this new facility would be justified by, among other factors, the replacement of Colonial and Heritage (A.R. 880), and that it would be the "sole operator and licensee" of the new facility.  (A.R. 821.)

On June 20, 1989, DPH approved the application with various conditions.  (A.R. 1308-1312.)  One condition was that, subsequent to the construction and licensure of the new facility, Colonial and Heritage would be "delicensed."  (A.R. 1310.)  Colonial subsequently withdrew from the Medicaid program effective September 17, 1994.  (A.R. 2889.)

On May 12, 1995, the Arbetter Corporation, a new entity that was related to the FRM I and FRM II Corporations by common ownership,[9] and that was created specifically for the purpose of holding the DON and license for the new facility, petitioned DPH to become the holder of the DON for the project.  (A.R. 172, 2890.)  DPH approved the transfer of the DON to the Arbetter Corporation on July 13, 1995.  (A.R. 1314, 2890.)

On June 19, 1995, DPH advised Heritage that Oak Knoll could open as soon as it obtained a State license.  DPH further stated that, pursuant to Medicare rules, Heritage's existing Medicare provider agreement would be transferred to Oak Knoll.  (A.R. 1713.)

On September 28, 1995, Heritage notified DPH of the facility's "desire to withdraw from the Medicare program at this facility effective October 13, 1995."  The provider's representative further stated that, "[o]nce we have moved into our new facility (Oak Knoll) we will be applying as a new provider for certification in the Medicare program."  (A.R. 1036, 2890.)  Heritage terminated its Medicare provider agreement effective October 13, 1995.  (A.R. 1283, 2890.)  Heritage thereupon filed its final Medicare cost report, which covered the period from January 1,

---

[9]All three corporations were owned by the same individual, Alfred Arcidi.  (A.R. 2890.)

1995, to October 13, 1995.  (A.R. 1168.)  However, the facility continued to participate in Medicaid pending the opening of Oak Knoll.  (A.R. 2890.)

Oak Knoll opened on November 6, 1995.  (A.R. 170, 1266, 2890.)  On that date, Heritage transferred its 35 residents (none of whom were Medicare eligible) to the new facility.  (A.R. 1719, 2890, 3122.)  The Heritage facility was then demolished, and the site was used to construct a parking lot for Oak Knoll.  (A.R. 3122.)

Heritage's existing Medicaid provider agreement with the State was transferred to the new facility.  (A.R. 2890.)  However, opting to reject Heritage's Medicare agreement, Oak Knoll applied for "initial Medicare certification" for 20 of its beds.  (A.R. 1045.)  Oak Knoll chose to obtain its own Medicare provider agreement to "obviate any possible confusion or mistaken connection between the old facilities and corporations, and the new." (A.R. 172-173.)

Effective November 20, 1995, the Arbetter Corporation d/b/a Oak Knoll entered into a new Medicare provider agreement with CMS, and was assigned a new Medicare provider number (i.e., 22-5682).  (A.R. 157, 1047, 1049, 1286, 2890.)  Oak Knoll admitted its first Medicare patient on November 20, 1995, and it received its first Medicare payment on the same date.  (A.R. 648, 2890.)  Oak Knoll's first Medicare cost-reporting period covered the period from November 6 to December 31, 1995.  (A.R. 149, 647-648, 654.)

On January 18, 1996, Oak Knoll requested an exemption from the Medicare cost limits as a "new provider" for its first cost-reporting period.  (A.R. 1264, 1318-1321.)  Oak Knoll's Medicare intermediary, the Aetna Life Insurance Co. ("the Intermediary"), forwarded this request to CMS along with a recommendation that the exemption request be granted.  (A.R. 1266.)  However, CMS denied the request on February 14, 1996.  (A.R. 1270.)  On October 8, 1997, Oak Knoll filed an appeal of the denial of its exemption request.  (A.R. 3151.)  In its appeal request, Oak Knoll noted that the reimbursement effect of the decision was $43,234.  (A.R. 1240.)  Oak Knoll requested an "exception" from the cost limits and, on February 4, 2000, the Intermediary granted the facility an exception in the amount of $148.65 per day.  (A.R. 1170.)

9

On August 30, 2001, the Intermediary issued a notice of program reimbursement ("NPR")[10] for Oak Knoll's cost-reporting period ending on December 31, 1999 (its first period subject to PPS for SNFs). (A.R. 2890, 3204-3205.) In the NPR, the Intermediary determined Oak Knoll's reimbursement for such period based on the application of the Federal rates only. Id. Oak Knoll filed a timely appeal of the denial of its request for transition period payment. Id.

The Board consolidated the two appeals, and it issued its decision on August 12, 2008. (A.R. 37-43.) In its decision, the Board (1) affirmed CMS' determination that Oak Knoll did not qualify for a new provider exemption for FY 1995, and (2) determined that the facility was entitled to transition period payment for FY 1999. Id.

On August 28, 2008, the Administrator notified the parties that he would review the Board's decision. (A.R. 27.) The Administrator issued his decision on October 14, 2008. (A.R. 1-18.) In the decision, the Administrator affirmed the Board's determination that Oak Knoll was not entitled to a new provider exemption for FY 1995.[11] Id. However, the Administrator reversed the Board's determination on the transition period payment issue. Id. The Administrator determined that the Intermediary had properly reimbursed Oak Knoll for FY 1999 on the basis of the Federal rates only. (A.R. 17-18.)

## II.   ARGUMENT

### A.   Standard of Review

The Court's review of the Administrator's decision is limited to whether the decision is arbitrary and capricious, an abuse of discretion, contrary to law, or unsupported by substantial evidence. See 42 U.S.C. § 1395oo(f) (incorporating the standards of 5 U.S.C. § 706).

### B.   The Administrator's Decision Should Be Granted Chevron Deference

The Administrator's interpretation of the pertinent statute, 42 U.S.C. § 1395yy(e), should

---

[10]A NPR tells the provider how much reimbursement the provider is entitled to for the cost year and provides appeal rights to the provider.

[11]Oak Knoll does not in this action challenge the denial of its request for a new provider exemption.

be evaluated under the principles of deference described in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).[12]  In analyzing an agency's interpretation of a statute under Chevron, a court first employs ordinary tools of statutory construction to determine whether "Congress has directly spoken to the precise question at issue."  Id., 467 U.S. at 842.  If Congress has directly spoken to the precise question at issue, the court must give effect to Congress's unequivocal intent.  Id. at 842-843.  However, if the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's [interpretation] is based on a permissible construction of the statute."  Id. at 843.

In applying the second prong of the Chevron test, a court must give "considerable weight" to the agency's interpretation of the statute.  Id. at 844.  Deference to the agency's construction is especially appropriate in cases, such as the present action, which raise technical issues under a complex regulatory scheme.  See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 97 (1st Cir. 2002).

This case also presents a question as to the validity of the agency's interpretation of its own regulations.  The courts "normally accord the agency particular deference in respect to the interpretation of regulations promulgated under [its rulemaking] authority."  South Shore Hosp., 308 F.3d at 97.  An agency's interpretation of its own regulation should be overturned only if it is "'plainly erroneous or inconsistent with' its language."  Id. (quoting Thomas Jefferson, 512 U.S. at 512).  "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'"  Thomas Jefferson 512 U.S. at 512 (quoting Pauley v. BethEnergy

[12]Because the Administrator issued his decision in the course of a formal adjudication under 42 U.S.C. § 1395oo(f), the Chevron test applies.  See Christensen v. Harris County, 529 U.S. 576, 587 (2000) (the Chevron tests applies to an "interpretation ... arrived at after ... a formal adjudication"); I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 424-425 (1999); North Broward Hosp. Dist. v. Shalala, 172 F.3d 90, 94 (D.C. Cir. 1999); Appalachian Reg'l Healthcare, Inc. v. Shalala, 131 F.3d 1050, 1054 (D.C. Cir. 1997); Good Samaritan Hosp. Reg. Med. Center v. Shalala, 85 F.3d 1057, 1061-1062 (2d Cir. 1999).

Mines, Inc., 501 U.S. 680, 697 (1991)).[13]

> **C.      The Administrator's Decision is Consistent with the Medicare Statute**
>
> > **1.      The Medicare Statute Does Not Unambiguously Provide That A SNF That Was Constructed And Established As A New Facility Following a Change Of Ownership ("CHOW") Must Be Considered, for Transition Period Purposes, As The Same SNF As The Predecessor Facility**

As required by Chevron, the first issue to be resolved in this case is whether Congress has "unambiguously expressed [its] intent" on the "precise question at issue." Chevron, 467 U.S. at 843. This question must be answered in the negative.

The statutory provision at issue in this case, 42 U.S.C. § 1395yy(e)(2)(E)(ii), states as follows:

> Treatment of new skilled nursing facilities - In the case of a [SNF] that first received payment for services under [Medicare] on or after October 1, 1995, payment for such services shall be made under this subsection as if all services were furnished after the transition period.

Id. This language establishes that entitlement to transition period payment is to be determined by the date on which "the SNF" received its first Medicare payment. In most cases, the identity of the SNF will be clear, and it will be a simple matter to determine when the facility received its first Medicare payment. However, the statute provides no guidance on how the date of first Medicare payment is to be determined in CHOW situations generally, and it certainly does not address the precise question raised by this case: whether a SNF that was constructed and established as a new facility following a CHOW must be regarded, for transition period purposes, as the same SNF as its predecessor.[14]

---

[13]The degree of deference to be afforded the Administrator's decision is not affected by the fact that the Board had previously reached a contrary position. See South Shore Hosp., 308 F.3d at 100 n.6 ("[W]e cede deference to the Secretary's determination, not the Board's, as the definitive statement of the agency's position"); Anaheim Mem'l Hosp. v. Shalala, 130 F.3d 845, 850-851 (9th Cir. 1997).

[14]There is no question that the transactions between Oak Knoll and Heritage/Colonial constituted a CHOW under Medicare rules. See South Shore Hosp., 308 F.3d at 99 (transfer of DON rights alone constitutes a CHOW). Oak Knoll's contention that there was no CHOW because "Oak Knoll is controlled by the same person who controlled the predecessor SNFs" (Pl's. Mem. at 17) is without merit. As the Administrator noted, the "provider" is the corporation or other legal entity that enters into the provider agreement with CMS, without regard to the ownership of such entity. (A.R. 15.) See also 42

Oak Knoll bases its claim that the statute unambiguously supports its position not on section 1395yy(e)(2)(E)(ii), but on 42 U.S.C. § 1395i-3(a), which defines a "SNF" as "an institution" that provides skilled nursing or rehabilitation services to residents and that meets the applicable Federal standards.  Id.  Construing "an institution" to mean "an establishment or place," and "not a particular operator, and certainly not an operator with a particular provider number or provider agreement," Oak Knoll concludes that, for transition period purposes, it must be regarded as the same SNF or institution as Heritage, one of the two facilities from which it received assets.  (Pl's. Mem. at 12.)

While Oak Knoll's interpretation may be plausible, it is not compelled by the language of the statute.  Indeed, the contention that Oak Knoll must be regarded as the same "SNF" or "institution" as Heritage is foreclosed by the First Circuit's decision in South Shore Hosp..  308 F.3d at 91-106.  In South Shore Hosp., the First Circuit examined the meaning of "provider" (which is equivalent to "SNF") and "institution" in the context of the "new provider" exemption regulation (i.e., 42 C.F.R. § 413.30(e)(1996)).  Id. at 95-96.  The plaintiff in South Shore Hosp. argued that "provider" and "institution" were "unambiguous and demand[ed] an interpretation at odds with the Secretary's rendition."  Id. at 98.[15]  However, the First Circuit found that the terms were "manifestly ambiguous" and, as such, required interpretation.  The Court explained that "the terms 'provider' and 'institution' ... subsume any number of components, changes in one or all of which might, depending on the context, lead one to deduce that a new provider has (or has not) been created."  Id.

---

C.F.R. § 489.18(a)(3) (providing that a "[t]ransfer of corporate stock ... does not constitute [a CHOW]");  Baptist Health v. Thompson, 458 F.3d 768, 778-779 (8th Cir. 2006).  In this case, the evidence is undisputed that Colonial and Heritage were owned, respectively, by the "FRM I Corporation" and "FRM II Corporation," whereas Oak Knoll is owned by "the Arbetter Corporation."  (A.R. 170, 1018, 1049, 2889-2890.)  Hence, a CHOW occurred.

[15]Interestingly, the plaintiff in South Shore Hosp. argued that its modernized, expanded facility could not be considered as the same "provider" as the defunct facility from which it had obtained its DON rights.  Id. at 96.  Oak Knoll, however, interprets an equivalent term ("SNF") to establish the opposite point - that is, that its facility must be regarded as the same facility that it purportedly replaced.

In Paragon Health Network, Inc. v. Thompson, 251 F.3d 1141 (7th Cir. 2001), the Seventh Circuit explained the inherent ambiguity of these terms in similar fashion.  The Court noted that a provider is "composed of many different attributes," such as staff, administration, equipment, and buildings, and that some of these attributes may be changed without changing the identity of the provider.  Id. at 1148.  However, the Seventh Circuit noted that there are only two situations where it can be definitively said that a "new provider" has been or has not been created:

> Of course, if all the various things that make up a SNF were new in the sense that they had not been part of another facility, then one would have to call that SNF a 'new provider.' Conversely, if a nursing facility did not change any of its aspects, it would unquestionably continue to be the same provider rather than a new one.

Id.  The Court determined that the "difficulty in drawing a line between these two extremes is what makes the word 'provider' ambiguous..."  Id.

In this case, while Oak Knoll has been casually referred to as the "replacement facility" for Heritage and Colonial, there are major differences between Oak Knoll and the prior facilities. These differences relate not only to the ownership, licensure, physical plant, and the level of care provided by the facilities (A.R. 3122), but also to the fact that Oak Knoll operates under its own Medicare provider agreement and, thus, has a legal and financial relationship with the Medicare program that is entirely divorced from the prior facilities.

Given the existence of these important variables, it is far from clear that Oak Knoll must be treated for transition period purposes as the same "SNF" as Heritage or Colonial.  Because the statute does not unambiguously require the Administrator to take this position, the question becomes whether the denial of Oak Knoll's request for transition period payment was reasonable.

### 2.    The Administrator Reasonably Determined That, For Transition Period Purposes, A SNF That Rejects Its Predecessor's Medicare Provider Agreement, Is A New And Different SNF

Given that the statutory term "SNF" is fraught with ambiguity, the Administrator was called upon to identify the attributes that make a replacement facility the same "SNF" as its predecessor.  The Administrator decided to draw the line in these cases based on whether the surviving entity accepted or rejected its predecessor's Medicare provider agreement.  (A.R. 15-

14

18.)  Thus, the Administrator determined that an entity that obtains the assets of an existing SNF, but that affirmatively rejects that facility's Medicare provider agreement (and thereby obtains its own unique provider number), will be regarded for transition period purposes as a different SNF than its predecessor.  Id.

This position is based on a reasonable interpretation of the statute.  The focus of the statute is when the SNF received its first Medicare payment.  42 U.S.C. § 1395yy(e)(2)(E)(ii).  As the Administrator noted, a "[p]rovider's 'payment' and right to receive payment is inseparable from the assignment of an individual and unique provider number."  (A.R. 14.)  See 42 U.S.C. § 1395cc(a)(1) (a provider "shall be eligible for payments under [Medicare] if it files with the Secretary an agreement").  Given the inseparable link between a provider's right to payment and its provider agreement, it is at least reasonable to decide that an entity that obtained the assets of an existing facility, but then opted to obtain its own provider agreement (following its successful completion of the initial survey and certification process) should be regarded as a different SNF than its predecessor.

The Administrator's position is not only consistent with the statutory language, it "provides administrative simplicity in addressing complex transactions among SNFs, hospitals, and other entities."  64 Fed. Reg. at 41654.  Focusing on the surviving entity's unique provider number allows the agency to determine whether the identity of the SNF has changed without comparing all of the myriad attributes of the prior and current facilities.  Similarly, in cases where two facilities merge or consolidate, the Administrator's approach avoids the need for examining the precise details of the transaction to identify which facility more closely resembles the surviving entity.  The question is easily resolved by reference to the surviving entity's Medicare provider number.  Id.

In this case, for example, while Oak Knoll equates itself solely with Heritage, it actually replaced two facilities: Colonial and Heritage.  (A.R. 160.)  Under Plaintiff's approach to the statute, the agency would be required to examine all the respective attributes of Heritage and

Colonial to determine which of these facilities, if either, should be regarded as the same facility as Oak Knoll.[16]  The Administrator's approach avoids this morass, and results in the sensible conclusion that Oak Knoll is different and distinct from both of its predecessors, by virtue of the fact that Oak Knoll entered the Medicare program as a new participant under its own provider agreement.  Because this position is based on a reasonable interpretation of the statute, it should be affirmed.

**D.        The Administrator's Position Is Consistent With The Medicare Regulations**

Plaintiff's contention that the Administrator's decision violates the transition period regulation, 42 C.F.R. § 413.340(e), is also without merit.  The regulation states as follows:

> *SNFs excluded from the transition period.*  SNFs that received their first payment from Medicare, under present or previous ownership, on or after October 1, 1995, are excluded from the transition period, and payment is made according to the Federal rates only.

Id.  To a limited extent, this provision clarifies the statute: the regulation indicates that the payment that qualifies a SNF for transition period reimbursement (that is, a Medicare payment made prior to October 1, 1995) can be made "under present or previous ownership."  The regulation thus specifies that the fact that the ownership of a SNF changed at some point after the date of an otherwise qualifying Medicare payment would not necessarily preclude the surviving entity from receiving transition period reimbursement.  However, the regulation does nothing to clarify the basic meaning of "SNF" which, like the word "provider," is manifestly ambiguous.  In other words, like the statute, the regulation provides no guidance on whether the identity of the SNF has changed following a CHOW.  This omission leaves open the possibility that a facility that has undergone a CHOW could so change its attributes that it would no longer be regarded, for transition period purposes, as the same SNF as its predecessor.

Moreover, another regulation defines a "provider" to include a "[SNF] ... that has in effect an agreement to participate in Medicare"  42 C.F.R. § 400.202.  This definition thus confirms

---

[16]Colonial never received a Medicare payment (it was certified under Medicaid, not Medicare).  (A.R. 2889.)  Hence, a determination that Oak Knoll was the same SNF as Colonial would have resulted in a denial of transition period payment.

that a key attribute of a SNF is its provider agreement, which gives it the right to claim Medicare payment. Under these provisions, then, it is at least permissible to regard the surviving entity's unique provider number as the key attribute that indicates whether the identity of the SNF has changed.

This position is also consistent with the regulatory provisions that deal with the assignment of provider agreements following CHOWs. See 42 C.F.R. § 489.18. Under this regulatory scheme, the purchaser of a facility may avoid the obligations and liabilities of the prior owner by rejecting the assignment of the existing provider agreement. Vernon Home Health, 21 F.3d at 696. However, as the Administrator noted, the purchaser in this situation "does not get the benefit of the past history of the facility." (A.R. 15.) Rather, before the purchaser can receive any Medicare payments, it will be required to independently demonstrate that it complies with all Medicare participation requirements. Consequently, it makes sense that an owner that has rejected a prior owner's provider agreement (and thereby avoided its liabilities and obligations) should not be able to utilize the operation of the facility under prior ownership as a basis for securing higher Medicare payments. Such a policy prevents SNF owners from entering into corporate reorganizations that benefit the owners, but disadvantage the Medicare program. It also allows a new owner "to make the choice of whether to accept assignment and balance, for itself, the advantages and disadvantages of accepting assignment of the provider agreement." (A.R. 16.)

Contrary to Oak Knoll's contention, the Administrator's denial of its request for transition period payment is in no way inconsistent with the denial of its "new provider" exemption request. The regulatory criterion for determining eligibility for transition period payment under PPS for SNFs is fundamentally different from the criterion for allowing new provider exemptions under the reasonable cost regime. (A.R. 14.) Both regulations refer to "present" and "previous" ownership. Compare 42 C.F.R. § 413.30(e)(1996) with 42 C.F.R. § 413.340(e). However, the new provider exemption regulation focuses on whether the provider "operated as the type of provider (or the equivalent) for which it is certified for Medicare" under present and previous

ownership.  42 C.F.R. § 413.30(e) (1996).  Thus, as the Administrator noted, the focus of the regulation is "how the prior owner of the transferred assets 'operated'."  (A.R. 8.)  In contrast, the transition period regulation looks at when the SNF "received [its] first payment from Medicare" under present or previous ownership.  42 C.F.R. § 413.340(e).

This difference in language explains the different results.  A SNF that obtains the assets of an existing facility, but rejects the assignment of its predecessor's provider agreement, can nevertheless be said to have operated as the same type of provider (or its equivalent) as its predecessor and, thus, be ineligible for a new provider exemption.  However, it is not clear from the transition period regulation that the owner of a SNF that rejected its predecessor's provider agreement must be regarded as having "received" a Medicare payment that was made to its predecessor under the predecessor's unique provider number.  Indeed, if the agency in this situation determines that the Medicare payment was for some reason improper, the new owner can justifiably claim that it never received the payment and, therefore, that it is not responsible for refunding it.

The two regulations also involve fundamentally different policy considerations.  As the Administrator noted, the purpose of the new provider exemption is "to allow a provider to recoup the higher costs normally resulting from low occupancy rates during the time it takes to build its patient population."  (A.R. 8.)  See also South Shore Hosp., 308 F.3d at 100 (characterizing the exemption as "special swaddling to prevent the financial drain of initial underutilization").  In this context, the Administrator can reasonably conclude (as he did in this case) that an entity that obtains the right under a State DON law to open a new facility, based on a commitment to "delicense" two existing facilities in the same location (A.R. 1310), "is not likely to face underutilization when prov[id]ing the same or equivalent type of services" and, thus, is not entitled to a new provider exemption.  (A.R. 8.)  See also South Shore Hosp., 308 F.3d at 102 ("[F]or purposes of construing the new provider exemption," it is reasonable "to attribute the operations of the seller to the acquirer of the DON rights.").

Whether the operations of the seller should be attributed to the purchaser for transition period purposes under PPS for SNFs poses an entirely different question. The purpose of transition period payment, with its declining FSR percentage and increasing Federal rate percentage, was to protect existing or established SNFs from the abrupt reimbursement changes that might have resulted from the immediate implementation of the new system. Where the purchaser of a existing SNF accepts the assignment of the seller's provider agreement, with all the financial burdens that come with that agreement, in order to continue the operation of the enterprise without interruption, the facility may reasonably be regarded as an existing SNF for transition period purposes. However, a different situation is presented when the purchaser elects to reject the assignment, and thereby to sever all financial connections with the prior facility, and to establish itself as a newly-certified entity. In this context, it is at least reasonable for the Administrator to view the surviving entity as a new SNF under PPS - one that has no financial need to be transitioned into the new payment system.

E.    **The Administrator Did Not Issue His Decision In Violation Of The Notice-and-Comment Requirements Of The Administrative Procedures Act**

Oak Knoll's contention that the agency issued section 2834 of the PRM in violation of the notice-and-comment requirements of the Administrative Procedure Act ("APA") (see Pl's. Mem. at 16) is unavailing. The determination under review in this case is the decision of the Administrator issued in the course of a formal adjudication. See generally Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 96 (1995) (referring to the Medicare provider appeals process as "an elaborate adjudicative structure"). That determination can and should be sustained as an appropriate exercise of adjudicatory authority, without regard to the pronouncements of the PRM.

As the Supreme Court has noted, the Administrator has no obligation "to promulgate regulations that ... address every conceivable question in the process of determining equitable [Medicare] reimbursement." Id. Rather, the Administrator follows a "sensible structure for [administering] the complex Medicare reimbursement process," by promulgating "regulations setting forth the basic principles and methods of reimbursement," and by issuing "interpretive

19

rules ... that advise providers how she will apply the Medicare statute and regulations in adjudicating particular reimbursement claims." Id. at 101.

The manual provision at issue in this case - section 2834 of the PRM - is exactly this sort of interpretive rule.  It is a "prototypical example of an interpretive rule 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers'." Id. at 99 (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 302 n.31 (1979)).[17]  Consequently, the manual section was exempt from the APA rule-making requirements.  5 U.S.C. § 553(b)(B).  See also Warder v. Shalala, 149 F.3d 73, 80 (1st Cir. 1998) (upholding a CMS policy that "addresse[d] an area of [statutory] ambiguity" as a valid interpretive rule).

### F.        Plaintiff's Reimbursement Estimates Are Based On Flawed Methodologies

The amount of additional Medicare reimbursement that Oak Knoll would receive if it prevails in this case is not an issue that is presently before the Court.  Rather, the issue would need to be resolved by the Administrator on remand in the event the Court determines that Oak Knoll is entitled to transition period payment.  Nevertheless, because Oak Knoll has made certain allegations regarding the amount at issue in this case (Pl's. Mem. at 2; A.R. 127, 149), the Defendant is compelled to address the matter at this juncture.

As noted previously, transition period payment is based upon a blend of the Federal rates and the FSR.  42 U.S.C. § 1395yy(e)(1)(A),(2)(C).  Under the statute, the FSR is based primarily on the allowable costs incurred by the facility during a base period, which the statute defines as "cost reporting periods beginning in fiscal year 1995."  42 U.S.C. § 1395yy(e)(3)(A).  While the statute does not refer to "Federal" fiscal year 1995, CMS has reasonably interpreted the statute as referring to such period - in other words, a facility's FSR is based on the allowable costs incurred during its cost-reporting period "beginning on or after October 1, 1994, and before October 1,

---

[17]As the Supreme Court has noted, the PRM provisions "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." Guernsey, 514 U.S. at 99.  While the PRM is binding on the intermediaries, the Administrator and the Board may choose to disregard or limit the application of a PRM provision.  42 C.F.R. § 405.1867.

1995."  64 Fed. Reg. at 41645.  See also PRM, § 2834; (A.R. 192).

Oak Knoll's current position is that the agency's denial of transition period payment deprived it of "approximately $1.4 million for the 1999 fiscal year alone."  (Pl's. Mem. at 2.)  The record reveals that Oak Knoll calculated this figure based on a FSR of $674.02 per Medicare day, which it derived from the allowable costs incurred by Oak Knoll during its first Medicare cost-reporting period (the 56-day period from November 6 to December 31, 1995).  (A.R. 17, 149, 151.)  This calculation does not include any cost data from Heritage's FY 1995 cost report.[18]

There are two problems with Oak Knoll's current estimate.   First, Oak Knoll's first cost-reporting period began on November 6, 1995 and, thus, was not a period "beginning in [Federal] fiscal year 1995."  42 U.S.C. § 1395yy(e)(3)(A).[19]  Because Oak Knoll's first cost-reporting period is not a period described in the statute, the cost data from such period cannot be used to calculate its FSR.  Second, as the Administrator noted, it is doubtful that Congress would have contemplated that a provider's "base year" costs would be determined by the costs incurred by a facility during a period as short as 56 days.  (A.R. 17.)  Basing the FSR on such a short period could result in a skewed calculation, especially if that limited period encompasses the "normal fill-up period" of a newly-opened facility.  (A.R. 3122.)[20]  Therefore, even if Oak Knoll is entitled to transition period payment, it would be error to calculate its FSR based solely on the costs incurred by the new facility during its first cost-reporting period.

In the administrative proceedings, Oak Knoll alleged that the agency's action deprived it of $364,414 in Medicare reimbursement for FY 1999.  (A.R. 127, 149, 3205.)  Oak Knoll calculated

---

[18]It is interesting that Oak Knoll seeks to qualify for transition period reimbursement based on Heritage's receipt of a Medicare payment during its final cost-reporting period, yet Oak Knoll does not want the cost data from that period to be included in the calculation of its FSR.

[19]Oak Knoll's first Medicare cost report clearly states that it covered the "PERIOD BEGINNING 11-06-95 AND ENDING 12-31-95."  (A.R. 52.)

[20]During Oak Knoll's first 56 days of operation, only 61 of its 119 beds were in service. (A.R. 647.)  See also (A.R. 3122) ("[t]he number of patients transferred numbered only 35 leaving [Oak Knoll] with 80 empty beds").  Thus, the period hardly constitutes a representative "base" period.

this figure based on a FSR of $370.40, which it derived from "combined" cost data obtained from Heritage's FY 1995 cost report (which covered the period from January 1, 2005 to October 13, 1995) and Oak Knoll's first cost report.  (A.R. 17, 149, 153.)  As the Administrator noted, the Medicare regulations do not explicitly allow a facility to use the cost data from multiple cost reports to calculate its FSR.  See (A.R. 17), 42 C.F.R. § 413.340(b) (providing that the FSR is calculated "based on the SNF's Medicare allowable costs from its fiscal year 1995 cost report").  See also 42 U.S.C. § 1395yy(e)(3)(A)(ii) (referencing the "applicable cost reporting period").  Moreover, Oak Knoll's prior estimate presents the same problem as its current claim: both estimates are based on data from Oak Knoll's first cost-reporting period, which is not a period beginning in Federal FY 1995.

If the calculation is based solely on Heritage's FY 1995 cost-reporting period, which is a period beginning in Federal FY 1995, the FSR (according to Oak Knoll's own calculations) would be only $202.91 (A.R. 150), which is less than its Federal rate ($265.41).  (A.R. 149, 152.)  In other words, if the FSR is calculated in this manner, Oak Knoll would receive less money under transition period reimbursement than under the Federal rates only.

## III.    CONCLUSION

For the reasons discussed in this memorandum, Defendant's Motion for Summary Judgment should be granted and Plaintiff's Motion for Summary Judgment should be denied.

Respectfully Submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ Sonya A. Rao
       Sonya A. Rao
       Assistant U.S. Attorney
       United States Attorney's Office
       John J. Moakley U.S. Courthouse
       1 Courthouse Way, Suite 9200
       Boston, MA 02210
Dated: October 15, 2010       (617) 748-3261

Of Counsel:
CLIFFORD M. PIERCE, Assistant Regional Counsel, Department of Health and Human Services