UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| OAK KNOLL HEALTH CARE CTR., | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 08-12051-DPW |
| MICHAEL LEAVITT, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION ON
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND DEFENDANT'S MOTION TO AFFIRM

July 25, 2011

SOROKIN, M.J.

The Administrator of the Centers for Medicare and Medicaid (CMS) (acting at the behest of the Defendant, the Secretary of the Department of Health and Human Services) made the seemingly contradictory determinations that the Plaintiff, Oak Knoll Health Care Center ("Oak Knoll"), both was, and was not, a pre-existing skilled nursing facility. The Administrator found that Oak Knoll was a pre-existing facility when ruling that it was not entitled to benefit from certain reimbursement regulations providing favorable treatment to brand-new nursing homes. The Administrator nevertheless found that Oak Knoll was not a pre-existing skilled nursing facility when ruling that it could not benefit from certain reimbursement regulations providing favorable treatment to pre-existing programs during a transition to a new Medicare rate structure.

1

Oak Knoll now seeks judicial review and reversal of the Administrator's denial only of this latter determination.[1]

While at first glance, the Administrator's determinations present a Catch-22 like scenario,[2] closer analysis reveals that the relevant statutes and regulations are not simply the reverse sides of the same coin, but rather implement differing policies utilizing slightly different language. In the context of the regulatory framework and the (largely undisputed) material facts, the Defendant made a permissible and reasonable interpretation of the governing laws which is entitled to deference and is supported by the record.

Accordingly, I RECOMMEND that the Court DENY Oak Knoll's Motion for Summary Judgment (Docket # 13) and ALLOW the Defendant's Motion to Affirm the Administrator's Decision (Docket # 18).

I.      LEGAL, PROCEDURAL AND FACTUAL BACKGROUND

The Relevant Statutory Scheme

The United States Congress established the Medicare Program in order to ensure that the aged and disabled would have access to health care services. See 42 U.S.C. §§ 1395 et seq. The Administrator of the Centers for Medicare and Medicaid (CMS) reimburses qualifying healthcare providers for costs incurred in treating Medicare patients. See 42 U.S.C. §§ 1395cc, 1395g.

---

[1] Because Oak Knoll has not appealed the Administrator's determination that it was not entitled to a "new provider exemption" from Medicare's routine cost limits for the fiscal year ending December 31,1995, I refer to that issue only insofar as that issue bears upon the arguments advanced by Oak Knoll and to provide additional factual context.

[2] From the 1961 novel Catch-22, by Joseph Heller, meaning a situation in which a desired outcome or solution is impossible to attain because of a set of inherently illogical rules or conditions.

"Any provider of services . . . shall be qualified to participate under this subchapter and shall be eligible for payments under this subchapter if it files with the Secretary an agreement" as specified in the Act. 42 U.S.C. § 1395cc(a)(1).

This case concerns Medicare's prospective payment system ("PPS") for skilled nursing facilities ("SNFs"), which Congress enacted in 1997. See generally Pub. L. No. 105-33, § 4432; 42 U.S.C. § 1395yy(e). Under this payment system (new at that time), Congress provided that the new "Federal rates" would generally be phased in with respect to an SNF during a transition period encompassing the facility's first three cost-reporting periods subject to the new system. 42 U.S.C. § 1395yy(e)(1)(A), (2)(E). Congress provided, however, that certain "new" SNFs would be ineligible for such "transition period" payment. 42 U.S.C. § 1395yy(e)(2)(E)(ii). The question before the Court is whether Oak Knoll is such a "new" SNF, ineligible for payment under the transition rates.

Congress provided a statutory definition of a SNF.

"In this subchapter, the term "skilled nursing facility" means an institution (or a distinct part of an institution) which -

(1) is primarily engaged in providing to residents-

    (A) skilled nursing care and related services for residents who require medical or nursing care, or
    (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, and is not primarily for the care and treatment of mental diseases.

42 U.S.C. § 1395i-3(a).[3]

This definition of an SNF contains no express "birth date" or other express illumination

---

[3] Although Congress has revised § 1395i-3 in various respects, the definition of an SNF has remained unchanged at all relevant times.

regarding the contours of the term "an institution," or what changes, mergers, consolidations or divestitures make two facilities one institution or permit one institution to trace its roots for purposes of Medicare reimbursement to another institution. The absence of such language is material in this case.

Elsewhere in Title 42, Congress specifically established when an SNF could obtain reimbursement under the transition payment rate:

> (E)  Transition Period
>
> (I)  In general
>
> The term "transition period" means, with respect to a skilled nursing facility, the 3 cost reporting periods of the facility beginning with the first cost reporting period.
>
> (ii)  Treatment of new skilled nursing facilities
>
> In the case of a skilled nursing facility that first received payment for services under this title on or after October 1, 1995, payment for such services shall be made under this subsection as if all services were furnished after the transition period.

42 U.S.C. §1395yy(e)(2)(E); See A.R. at 201.

The relevant portion of the agency's implementing regulation, 42 C.F.R. § 413.340, further defines this statutory provision. It states:

> (e)  SNFs excluded from the transition period. SNFs that received their first payment from Medicare, under present or previous ownership, on or after October 1, 1995, are excluded from the transition period, and payment is made according to the Federal rates only.

42 C.F.R. § 413.340(e); See A.R. at 203-04.

CMS has developed and published interpretive rules for use in applying the statutory and regulatory provisions disputed in this case. Pursuant to these rules, the date an SNF received its

4

first Medicare payment is the date the agency issued the first payment under the present operative provider agreement. CMS Pub 15, § 2834(A); See A.R. at 192. Ordinarily a change in ownership or control of an SNF does not necessarily require a new provider agreement. Certain consequences flow from entering into a new provider agreement -- perhaps most significantly, a provider entering into a new provider agreement after a change of ownership is not liable for any overcharges etc. arising under a prior provider agreement. A new provider agreement results in a new provider number, and thus the number marks whether or not such a change occurred. In this case, under the interpretive rules a new provider agreement resets the first payment date for purposes of determining whether an SNF may obtain reimbursement at the transition rate.

The interpretive rules, found at CMS Pub 15, § 2834, provide in relevant part as follows:

> A. Steps to Calculate Payment Under SNF PPS - The intermediary will use the following steps in order to determine how to make payment to provider's [sic] under SNF PPS.
>
> Step 1. Determine if the SNF qualifies for Federal Rate or Transition Rate using the following rules.
>
> SNFs Receiving the Federal Rate - SNFs who first received payment from Medicare (i.e., based on when the payment was issued by the intermediary), under its current provider number on or after October 1, 1995, are paid based on the Federal rate only . . . Where a merger or consolidation has occurred, a determination is made based on the payment history of the surviving entity as indicated by the surviving SNF provider number.
>
> SNFs Receiving the Transition Period Rate - SNFs who first received payment from Medicare (i.e., based on when the payment was issued by the intermediary), under its current provider number prior to October 1, 1995, are paid based on the transition rate only and are excluded from receiving the Federal rate . . . Where a merger or consolidation has occurred, a determination is made based on the payment history of the surviving entity as indicated by the surviving SNF provider number

CMS Pub 15, § 2834(A); See A.R. at 192.

Oak Knoll obtained a new provider agreement when it opened and obtained its first payment under the new provider agreement on or after October 1, 1995, and, as a result, under the interpretation applied by the Administrator, Oak Knoll was a "new" SNF not entitled to reimbursement under the transition rates.

2. Factual Background

The relevant facts are largely undisputed by the Parties.

This appeal grows out of the replacement of two existing facilities by a new facility on the same grounds. Docket # 15 at ¶ 1. Colonial House Nursing Home and the Heritage Long Term Care Center were both located on a single property in Framingham, Massachusetts. Id. Although different corporations owned each of these two entities, Dr. Alfred Arcidi was the ultimate owner and controlling authority of both corporate entities. Id. at ¶ 7; A.R. at 172-173. Heritage and Colonial each provided skilled nursing care prior to October 1, 1995. Docket # 15 at ¶ 8; A.R. at 2890.

Colonial and Heritage were certified to participate in the Medicaid program in 1980 and 1981 respectively. Heritage joined the Medicare program on July 1, 1990 while Colonial never participated in Medicare. A.R at 2889; Docket # 15 at ¶ 4.

In 1989, the entity owning Heritage had obtained a determination of need (DON) from the Massachusetts Department of Public Health to build a brand new skilled nursing facility (Oak Knoll) on the same property in Massachusetts on which Colonial and Heritage sat. A.R. at 160-164. On July 31, 1989, the Massachusetts Department of Public Health approved this application subject to the condition that Colonial and Heritage be delicensed upon the construction and licensure of Oak Knoll. A.R. at 1310.

6

During May of 1995, Dr. Arcidi wrote to DPH to "request[] that the DON be transferred" to a third corporation he owned and controlled. A.R. at 172. In that letter, Dr. Arcidi explained:

> Those two nursing homes [Colonial and Heritage] will no longer exist, being replaced by the new Oak Knoll Long Term Health Care Center. We feel that transferring the DON to a new corporation created specifically for the purpose of holding the DON and being the licensee of the state is more appropriate since it will obviate any possible confusion or mistaken connection between the old facilities and corporations, and the new.

A.R. at 172-73.[4]

While the DON transferred to the new corporation, the management and control of Oak Knoll remained unchanged from that of Heritage and Colonial. A.R. at 172-73.

Later in 1995, the relationships between Heritage, Oak Knoll and Medicare changed.[5] On September 28, 1995, Heritage wrote to DPH "to inform you of our desire to withdraw from the Medicare program at this facility [Heritage] effective October 13, 1995." A.R. at 1036, 1283. Rather than transfer the existing provider agreement and relationship from Heritage to Oak Knoll, the letter went on to notify DPH that "[o]nce we have moved into our new facility (Oak Knoll) we will be applying as a new provider for certification in the Medicare program." Id. at 1036, 2890. These requests were granted. Id. at 2890.

Subsequently, the Heritage building was closed, and all thirty-five residents (none of whom were Medicare-eligible) were transferred to Oak Knoll. The same group of individuals who had managed Heritage also managed Oak Knoll. Docket # 15 at ¶ 3. The same person served as Medical Director, and with minor exceptions, all of Heritage's staff moved to Oak

---

[4] This statement occurred in the course of a request to transfer the DON, not, as suggested by the government, in the later request for a new Medicare provider agreement. Compare Docket #19 at 9 with A.R. 172-173.

[5] Colonial was never a participant in the Medicare program. A.R. at 2889.

Knoll. Id. Colonial also closed. Id. at ¶ 2.

Effective on November 20, 1995, Oak Knoll's corporate owner (as it had indicated it would in September of that year) entered into a new Medicare Provider Agreement. A.R. at 157. In recognition of the new governing agreement, Oak Knoll was assigned a different provider number from that under which Heritage had operated. Id. Also on November 20, 1995, Oak Knoll admitted its first Medicare patient and received its first Medicare payment. A.R. at 648, 2890. Of course, the November 20, 1995 date, if the operative date, would render Oak Knoll ineligible for reimbursement under the transition payment rate pursuant to 42 U.S.C. § 1395yy.

    3.    Administrative and Procedural History

Oak Knoll made two requests of the Administrator. It sought a "new provider exemption" from Medicare's routine cost limits for the fiscal year ending December 31, 1995. A.R. at 618, 594. CMS rejected this request because:

> . . . the key to understanding HCFA's exemptions is recognizing that we look at the operation of the institution or institutional complex under 'past and present ownership' exclusive of specific provider numbers, names, etc., since these are subject to change – to determine if the institution or institutional complex provided skilled nursing or rehabilitative services.

Id. at 175.

Thus, CMS determined that Oak Knoll was not a new SNF. This decision by the Administrator is not appealed by Oak Knoll.

Second, Oak Knoll made a request for Medicare transition period rate payments for fiscal year 1999. Id. at 38. Applying the interpretative rules discussed above, CMS rejected this request as well. Id. at 32. Because Oak Knoll was operating under a different provider number than Heritage, CMS determined that Oak Knoll's first payment date was the first payment under

the new agreement rather than the first payment date under the Heritage agreement, or some earlier date. Id. at 42.

Oak Knoll appealed both decisions to the Provider Reimbursement Review Board. Id. at 37.

The Review Board consolidated Oak Knoll's two appeals. Id. On August 18, 2008, the Review Board upheld the denial of the new provider exemption, however, it found that Oak Knoll was entitled to the transition period payment rate. Id. at 42-43. It concluded that Oak Knoll had received Medicare payments before October 1, 1995 by finding that the interpretative rules added an additional criterion beyond the clear meaning of controlling law. Id.

The Administrator's Decision

On October 14, 2008, the Administrator affirmed the Review Board's rejection of the new provider exemption, but reversed the Review Board's determination with regard to the transition period reimbursement pursuant to 42 U.S.C. §1995oo(f)(1). Id. at 10-18. The Administrator determined that Oak Knoll was not entitled to transition period reimbursement. Id. at 17.

According to the Administrator, Congress established the filing of an "agreement" with the Secretary as a condition precedent to payment under the Medicare system. Id. at 10 (citing section 1866 of the Act). The agency's regulations define a "Medicare SNF as, inter alia, 'a . . . SNF . . . that has in effect an agreement to participate in Medicare.'" Id. (quoting 42 C.F.R. § 400.202). From this, the Administrator concluded that payment eligibility requires the filing of a provider agreement with the Secretary. Under other regulations, upon a change of ownership, the "existing provider agreement will automatically be assigned to the new owner." Id. (citing 42

9

C.F.R. § 418.18). In this circumstance, the new owner is subject to all applicable statutes, regulations and the terms and conditions of the existing agreement. Id. (citing 42 C.F.R. § 489.18(d)). "However, the new owner may decline to accept the existing provider agreement and voluntarily terminate the existing provider agreement." Id. "In such a case, the new owner must apply and meet the conditions of participation . . . along with entering into a new provider agreement." Id.

In rejecting Oak Knoll's (and the Board's) argument, the Administrator quoted the Secretary's response to comments from 1999:

> "[O]ur policy, as stated broadly in transmittal 405 of the Provider Reimbursement Manual, required that, for purposes of determining a provider's eligibility for the transition [reimbursement rate] Medicare makes its determination based on the date of first Medicare payment (interim or otherwise) under the present provider number.
>
> For example, when an SNF undergoes a change in ownership, such as a merger or a consolidation, <u>the payment is determined by the payment history of the surviving entity as indicated by the surviving SNF's provider number.</u> This conforms with longstanding reimbursement policy and payment principles as applied under the former reasonable cost payment system and provides administrative simplicity in addressing complex transactions among SNFs, hospitals, and other entities.
>
> Id. at 13-14 (emphasis provided by Administrator)(quoting 64 Fed. Reg. 41644, 654 (July 30, 1999)).

The Administrator found that "this interpretation is consistent with the Medicare statute." Id. at 14. The Administrator also explained that the criteria for the transition reimbursement rate "is not the same" as the criteria for a "new provider" exemption because the latter "focuses on whether the provider has 'operated' as the type of provider 'under previous or present ownership'" while the former "focuses on when 'the SNF' received its first 'payment' 'under present or previous ownership.'" Id.

10

Regarding Oak Knoll's contention that the provider number is irrelevant to the transition reimbursement analysis and its assertion that the same individual continues to control the various assets in this case, the Administrator ruled that "a provider is always no more than the entity that entered in to the provider agreement" without regard to the underlying ownership. Id. at 15. (citing Baptist Health v. Thompson, 458 F.3d 768 (8th Cir.2006)). This is particularly so, according to the Administrator, because when a new entity accepts the prior entity's provider agreement it "is obligated for any liabilities or civil money penalties [and] existing plans of correction" of the former owner. Id. However, when, as occurred in this case, the provider rejects automatic assignment of the provider agreement, the "provider [Oak Knoll] is not obligated for the past owner's liabilities, but also does not get the benefit of the past history of the facility." Id. (citing U.S. v. Vernon Home Health, 21 F.3d 693 (5th Cir.1994) (by accepting assignment new owner, albeit unknowingly, accepted terms of agreement and became liable for overpayments)). Thus, the Administrator concluded that its interpretation "is not only consistent with the statute, but prudent for the administration of the Medicare program and the need to ensure the integrity of the Medicare Trust Fund" by allowing a provider to choose between a new or continued provider relationship while eliminating "questionable changes of ownership for monetary gain that do not also provide benefits to the program." Id. at 16.

<u>This Lawsuit</u>

Oak Knoll made a timely application for judicial review of the Administrators' decision regarding the transition period reimbursement by filing this action on December 10, 2008. Docket # 1; 42 U.S.C. §1395oo(f)(1). Oak Knoll has not appealed and does not challenge the rejection of the new provider exemption it sought in the administrative proceedings.

II.  DISCUSSION

Oak Knoll argues that the Administrator's denial of its request for transition rate period payments was arbitrary and capricious because it was based not upon the statute, but rather upon an interpretation of the Department's regulations contained in its manual (which was not itself a proper exercise of the Department's rulemaking authority), and also because the Defendant has taken inconsistent positions with regard to Oak Knolls' two requests (namely, that Oak Knoll is the same provider as its predecessor institutions when considering its request for a new provider exemption, yet that Oak Knoll is a distinct provider when considering its request for transition rate period payments).

Standard of Review

This Court reviews a decision of the Secretary overruling the Provider Reimbursement Review Board pursuant to 42 U.S.C. § 1395oo(f), which provides that the action shall be tried pursuant to the applicable provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 706. The APA commands reviewing courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In interpreting the statutory scheme at issue, and the reasonableness of the agency's construction thereof, the reviewing court is confronted with two questions: first, whether the Congress has directly addressed the precise issue (in which case the Court must give effect to the unambiguously expressed Congressional intent, rejecting any contrary administrative constructions), and second, if the statute is silent or ambiguous with respect to the specific issue, whether or not the agency's answer is a permissible construction of the statute. Chevron, U.S.A.,

Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). The agency's construction of the statute need not be the only permissible construction or even the one the reviewing Court would have reached if considering the matter as one of first impression, so long as it is permissible. Id. at 843 n. 11. "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Id. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)). Where Congress explicitly left a gap for the agency to fill, such regulations are given controlling weight unless arbitrary, capricious or manifestly contrary to the statute. Id. at 843-44. Where the legislative delegation to an agency on a particular question is merely implicit, the reviewing court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Id. at 844. The principle of deference to administrative interpretations of statutory schemes is to be followed whenever it involves reconciling conflicting policies, and "a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." Id.

In addition, reviewing courts must give substantial deference to an agency's interpretation of its own regulations. Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). The agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. Id. "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Id. (quoting Pauley v. BethEnergy

Mines, Inc., 501 U.S. 680, 697 (1991)). The Medicare program is such a program. Id.

### Ambiguity of the Statute

Oak Knoll argues first that the statute, as written, unambiguously means that an "establishment or place" that received its first Medicare payment prior to October 1, 1995, is eligible for transition payments, since the definition of the term "Skilled Nursing Facility" defines it as an "institution (or distinct part of an institution)." Docket # 14 at 12 (citing 42 U.S.C. §1395-3(a)). "An institution," it argues without citation "is an establishment or place." Id.

The Court disagrees that the statute is unambiguous. The statute cited by Oak Knoll defines what constitutes an SNF, but the definition is silent regarding the circumstances under which two SNFs are one or when an SNF can trace its lineage to another institution or whether a change of ownership, staff, building or other factors creates a new SNF for purposes of the transition reimbursement payment system.[6] In South Shore Hosp., Inc. v. Thompson, 308 F.3d 91 (1st Cir.2002), the First Circuit found (in the context of the new provider exemption) that the terms "provider" and "institution" were "manifestly ambiguous" and required interpretation because the terms "subsume any number of components, changes in one or all which might, depending on the context, lead one to deduce that a new provider has (or has not) been created." Id. at 98; See also Paragon Health Network, Inc. v. Thompson, 251 F.3d 1141, 1148 (7th

---

[6] The transfer of the DON from the corporate owner of Heritage to the corporate owner of Oak Knoll constituted a change of ownership under Medicare rules. See supra, at 3; South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 99 (1st Cir.2002).

Cir.2001) (the term "provider" is ambiguous because of the inherent difficulty in drawing the line between the two extremes of a new SNF on the one hand in which all the various things — such as staff, administration, equipment, or buildings -- were new, and one on the other hand where none of these aspects had changed). The term "SNF" as used in the transition rate statute and regulation are analogous to the term "provider" in the South Shore and Paragon cases. Moreover, Oak Knoll's interpretation takes no account of the related statutory provisions requiring an agreement to obtain reimbursement for instance or the myriad of mergers, dissolutions, or cessations that may occur requiring a decision about the "birthday" of the SNF in order to apply the statute's first payment rule.

The Administrator reached a reasonable resolution of the ambiguity by determining that the provider relationship as represented by the provider number controls when an SNF received its first Medicare payment. The statutory language focuses upon the date of first payment and the related statutory provisions define the reimbursement relationship in terms of a payment agreement. In light of these provisions, the Administrator's decision to define the date of first payment as the date of first payment under the current operative agreement is a reasonable construction of the statute. See Community Care v. Leavitt, 537 F.3d 546, 550 (5th Cir.2008) (upholding that Secretary reasonably concluded that, for purposes of the transition reimbursement rate, the SNF was separate provider from the hospital of which it was a unit because the SNF was a "provider" entering into an agreement to participate in Medicare and obtained "its own provider number"). The provider number is a mere administrative proxy for that conclusion. Identification of the SNF through a provider number is an administratively-convenient and reasonable basis for determining whether an SNF received payments prior to

15

October 1, 1995, without making fact-intensive inquiry into the numerous factors identified by the Paragon court. See Paragon, 251 F.3d at 1148. Moreover, the Administrator's construction of the statute places initial control with the provider upon a change of ownership. An SNF may accept the automatic assignment of the existing provider agreement, along with any attendant outstanding balance or the risk of liability for prior overcharges, or may elect instead (as Oak Knoll did in this case) to terminate the existing provider relationship and to create a new one unburdened by any prior history under the old provider agreement.

Consistency or Tension Between the Administrator's Two Determinations

Next, Oak Knoll contends that the Administrator's decision was arbitrary and capricious by finding that Oak Knoll was a new SNF for purposes of transition reimbursement, but an existing SNF for purposes of the cost containment program. The two issues, however, present different questions; they are not the flip side of the same coin. As noted, the Administrator reasonably determined that the date of first payment is determined by reference to the date of first payment under the current provider agreement. A.R. at 13-14. In contrast, the cost containment determination (which Oak Knoll did not appeal) examined the SNF's operations. The applicable regulation defines a new provider as one that has "operated" for less than three years. 42 U.S.C. §1395yy(e)(2)(E). This operational focus directs consideration of the continuity of the business operations and thus serves to confine the new provider exemption to those new providers incurring higher costs due to underutilization during the first three years. A.R. at 5-6. The difference in the governing language – payment versus operation – reflect the different statutory purposes and explain, reasonably, the different interpretations applied by the Administrator and the different results reached.

Section 2834A of the Manual

Oak Knoll next argues that Section 2834A of the Manual (providing that the provider number is determinative in determining if an SNF qualifies for Federal Rate or Transition Rate, See supra at 7-8) is not due any deference because it is contrary to the unambiguous and clear intent of Congress that eligibility be based only upon the date of receipt of Medicare payments by the institution regardless of provider number. Docket # 14 at 14. It notes that the implementing regulation does not suggest that the transition rate be tied to the use of a particular provider number or agreement, and that the requirement is found solely in the manual. Id. at 15. As discussed supra, the statute is not unambiguous, Oak Knoll's argument is not persuasive and the interpretation, as noted by the Administrator, appeared in the Federal Register. A.R. at 13-14 (quoting 64 Fed.Reg. 91644, 41654 (July 30, 1999)). Moreover, the date of receipt only begs the question – answered by the Administrator's interpretation – of what receipts qualify for consideration in determining the first receipt.

Oak Knoll further argues that the Manual's provision regarding the provider number is in any event invalid because it is a substantive rule (rather than merely interpretive) affecting its rights and is therefore subject to the APA's notice and comment requirements, which it argues were not satisfied. Docket # 14 at 16-17. Because the Court does not agree that the Manual provision is in any way inconsistent with the statute or the regulation (see, supra), the Manual provision at issue does not effect substantive change in the regulations; rather it is merely an interpretive rule and is not subject to the notice and comment requirements of the APA. See Shalala v. Guernsey Mem. Hosp., 514 U.S. 87, 99-100 (1995).

Finally, Oak Knoll attacks the policy justifications offered by the administrator. First, it

notes that the Administrator's admonitions concerning the assumption of a previous owner's provider agreement and the risks and benefits associated with same are inapplicable to this case because the same individual "controlled the predecessor SNF's." Docket # 14 at 17. That individual did so, however, through distinct corporate entities, who were themselves the owners of the facilities (and were the entities that entered into provider agreements). Finally, it argues that "Oak Knolls' eligibility for transition rate reimbursement is not a benefit established under a previous Medicare provider agreement: it is a benefit conferred under the Statute based on the original date of payment." Id. at 18. The argument is circular, however, in the sense that it presupposes the correctness of Oak Knoll's position. The Administrator rendered a reasonable interpretation of the governing statutes and regulations which is entitled to deference and is supported by the factual record in this case.

III. CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court DENY the Plaintiff's Motion for Summary Judgment (Docket # 13) and ALLOW the Defendant's Motion to Affirm the Administrator's Decision (Docket # 18).[7]

SO ORDERED.

    /s / Leo T. Sorokin
UNITED STATES MAGISTRATE JUDGE

---

[7] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).